## North and South Rolling Stock Co. v. Henry O'Hara.

1. CONSTRUCTION OF CONTRACTS—*Covenants and Conditions Subsequent.* Courts are not inclined to construe clauses in contracts as conditions subsequent when such a construction will divest a purchaser or lessee of his property or estate or subject him to inequitable damages, but rather to construe them as covenants, with damages to be assessed according to the actual injury sustained.

2. SAME—*Conditions of Forfeiture.*—The construction of a provision in a mutual contract, the breach of which by one party enables the other party to throw it up and treat it as null and void, so that it shall have this effect, for which purpose it must be construed as an absolute condition, is sometimes a question of extreme difficulty.

3. SAME—*Form of Conditions.*—No formal words are requisite to constitute a condition in a contract, and perhaps no formal words will constitute a condition if it is obvious from the whole instrument that it was not the intention of the parties to do so.

4. SAME—*Intention of the Parties.*—The construction of a contract must always depend upon the intention of the parties to be collected in each particular case, from the terms of the agreement itself, and from the subject-matter to which it relates.

5. SAME—*Does Not Depend Upon the Formal Arrangement of Words.*—The construction of a contract does not depend upon any formal arrangement of words, but on the reason and sense of the matter as it is to be collected from the whole contract.

6. SAME—*Where a Breach of a Condition is a Breach of the Whole Contract.*—When a condition covers the whole ground of the contract and can not be severed from it, a breach of the condition is a breach of the whole contract, which gives the other party the right of avoiding or rescinding it altogether; but when the condition is distinctly separable, so that much of the contract may be performed on both sides as though it were not there, it will be treated as a provision, the breach of which gives only right of action to the injured party.

7. SAME—*Name by Which Called, Immaterial.*—When the transaction is in reality and in legal effect a sale, conditioned upon the payment of the purchase price in successive instalments, it can not be modified nor its legal effect assailed by the fact that the parties speak of it as a lease and call the instalments rent.

8. FORFEITURES—*Not Favored.*—Courts do not regard forfeitures with favor and never enforce them unless the evidence is clear that such was the intention of the parties.

9. PENALTIES—*In Contracts.*—When the subject-matter of a contract is such that the damages for its breach can be computed by definite rules, courts will usually treat the sum agreed upon as a penalty, especially where there is a disparity between that sum and the damages actually sustained.

10. SAME—*Extent of the Recovery.*—No greater sum can be recovered under a penalty than that which will compensate the party suing for his actual loss.

**Assumpsit,** breach of a contract in writing. Error to the City Court of East St. Louis; the Hon. B. H. CANBY, Judge, presiding. Heard in this court at the August term, 1897. Reversed and remanded. Opinion filed March 1, 1898.

## STATEMENT OF THE CASE.

This action was tried by agreement, together with another between the same parties, and judgment in this case obtained in favor of defendant in error for $60,639.70.   The action is based upon the following agreement:

"This agreement, made this first day of February, A. D. 1888, by and between Henry O'Hara, of the city of St. Louis, Missouri, party of the first part, and the North and South Rolling Stock Company, a corporation organized under the laws of the State of Illinois, party of the second part, witnesseth, that in consideration of the covenants herein expressed to be performed by the party of the second part, and the sum of one dollar, the receipt whereof is hereby acknowledged, the party of the first part does hereby deliver and lease to the party of the second part the following described rolling stock, consisting of box and stock freight cars, free from interruption or interference, except as herein provided, and which are now running in use on the lines of the St. Louis, Alton & Terre Haute Railroad Company and connections, for a period of fifteen years from date hereof, to wit:   Seventy-six (76) stock cars, numbered consecutively from 2201 to 2276 inclusive, and marked 'St. Louis and Cairo Short Line R. R.;' also two hundred (200) box cars, numbered consecutively 3501 to 3700 inclusive, and marked 'St. Louis and Cairo Short Line R. R. Through Line Car;' the said stock and box cars to be held by the party of the second part, and under its sole control and possession during the existence of this agreement and lease.

"The party of the second part shall have full power and right to collect for its own use the earnings of said rolling stock from whatever source it may accrue, com-

mencing with the earnings of December, 1887 (which are collected in February, 1888).

"The party of the first part hereby agrees to sell and convey all his right, title and interest in the before mentioned rolling stock at any time which the party of the second part may elect during the next ten years, or on or before January 18th, A. D. 1898, for the sum of four hundred seven and 40/100 dollars for each and every stock car, and four hundred seventeen and 52/100 dollars for each and every box car. It is understood and mutually agreed that there is an indebtedness on said seventy-six stock cars, due by Henry O'Hara of twelve thousand dollars ($12,000) payable in notes to the order of W. Bayard Cutting, and an indebtedness of seventy-six thousand, four hundred and fifty-two dollars ($76,452.00) in notes, payable to the order of Post, Martin & Company, being one hundred and twenty notes of $637.10 each, payable monthly.

"It is further agreed that said party of the first part shall allow to the said party of the second part, to be charged to him on its books, the sum of seven thousand, six hundred and ninety-three dollars and ten cents, which amount is full amount of mileage earned on all that part of the rolling stock up to November 30, 1887, and said amount shall also be allowed as a part of the purchase money, and a credit on said rolling stock.

"Now in consideration of this lease and the earnings to be secured from the use of the above described rolling stock by the party of the second part, and to accrue to its benefit, and of the covenants made herein by the party of the first part, the said party of the second part hereby agrees to issue to the party of the first part one thousand shares of the capital stock of one hundred dollars each par value, fully paid up.

"The party of the second part agrees to assume and pay the before mentioned indebtednesses as they fall

due, amounting in all to eighty-eight thousand, four hundred and fifty-two dollars ($88,452), and of this amount there shall be charged on the books of the company the sum of seventy-two thousand dollars ($72,000) against the party of the first part, which shall be allowed as a credit on the purchase of the rolling stock leased under this contract, which purchase is herein contemplated as aforesaid.

"The party of the second part further agrees to pay as rental under this lease six per cent per annum on the difference between the value of the cars and the indebtedness before mentioned, and this rental is to be placed to the credit of the party of the first part on the books of the company, and shall not be paid out until after the indebtedness herein assumed is liquidated and canceled.

"Said party of the second part agrees at its own expense to keep and maintain said rolling stock in good repair, and pay all taxes or other expenses attaching to same of any character whatever, and that it will make all repairs promptly, so that there will be no deterioration except that resulting from age. It further agrees to insure said rolling stock at its own expense for benefit of said first party, and keep same insured when required in writing to that effect.

"The party of the second part agrees to purchase said rolling stock from the party of the first part within ten years from date hereof, at the price and sum for each car hereinafter mentioned, to wit, four hundred and seven dollars and forty cents ($407.40) for each and every stock car, and four hundred and seventeen dollars and fifty-two cents ($417.52) for each and every box car, and when said party of the second part shall give notice in writing to the party of the first part of its desire to complete and consummate that part of this contract, the said party of the first part shall,

on payment of any amounts found to be due him, execute a bill of sale for said rolling stock to the party of the second part. The said party of the second part agrees to replace any part of this rolling stock which may be destroyed at its own expense promptly and of like character and condition to that destroyed. It further agrees to return said rolling stock promptly at the termination of this agreement without expense to the party of the first part, unless it shall have been purchased as hereinbefore mentioned. On the purchase and sale of this rolling stock as hereinbefore specified, this lease shall cease and become void.

"It is mutually agreed that all of said rolling stock shall remain on the line of the St. Louis, Alton & Terre Haute R. R., and connections, and retain its present marks and respective numbers.

"It is further agreed that in case the party of the second part fails to perform any of its covenants herein expressed, and shall continue to do so, after receiving ten days' written notice of such failure, it shall, at the request of the party of the first part, return and deliver all of the rolling stock herein described, or its equivalent in money at the price herein mentioned, promptly to the party of the first part in good order, depreciation by age excepted, and pay all amounts found to be due without any delay whatever.

"The party of the second part shall allow on its books to the credit of the party of the first part the sum of seventeen hundred and fifty-two dollars ($1,752) as interest on the rolling stock herein described, which is allowed to said party of the first part in consideration of his putting in said rolling stock at cost to said party of the second part, and allowing said second party the mileage earned during the same period of time as hereinbefore stated.

"And the party of the first part, for himself, heirs

and assigns, and the party of the second part, itself, assigns and successors, are hereto firmly bound.

"HENRY O'HARA.            [SEAL.]

"NORTH AND SOUTH ROLLING STOCK COMPANY,

"By J. S. BERTHOLD, President.

"Attest:    C. M. JENNINGS, Secretary."

The declaration as it appears from the record consists of two counts. The first count, after reciting the agreement, is as follows: "And thereupon plaintiff delivered to the defendant all of the rolling stock and cars mentioned in said lease and agreement, and the defendant has had the same from that time in its possession and under its control, and has collected all the earnings thereof from whatsoever source they accrued for its own use; and the plaintiff avers that afterward, to wit, on the first day of December, 1895, all the indebtedness mentioned in said lease and agreement assumed, was liquidated, paid and canceled, whereby plaintiff became entitled to the six per cent rental mentioned in said agreement and lease, and being so entitled, on the twenty-third day of December, 1895, demanded payment of said rental and notified the defendant in writing that unless the same was paid within the time required by said lease and agreement, to wit, ten days, the plaintiff would insist upon a forfeiture of said lease and agreement, and a return of all the aforesaid rolling stock, or the payment of its equivalent in money, as provided in said lease and agreement, and the plaintiff avers that the defendant failed and refuses to pay said rental, or any part thereof for more than ten days, whereupon the plaintiff, on the sixth day of January, 1896, demanded and requested in writing that the defendant return and deliver to him the rolling stock described in said lease and agreement, or pay to him its equivalent in money at the price mentioned in said lease and agreement as provided therein; but the defendant

refused to return and deliver said rolling stock to the plaintiff and thereby became liable to pay him its equivalent in money, to wit, the sum of $140,000, and being so liable, the defendant, in consideration thereof, then and there promised to pay the plaintiff the said amount." '

The second count, after reciting the agreement, is as follows:

"And the plaintiff avers that afterward, to wit, on the first day of December, 1895, all the indebtedness mentioned in said lease and agreement, the payment of which defendant had assumed, was liquidated, paid and canceled by defendant, whereby the defendant became liable to pay the plaintiff as rental under said lease and agreement six per cent per annum on the difference between the value of said cars and the said indebtedness, which amounts to a large sum, to wit, the sum of $30,000. And being so liable, the defendant, in consideration thereof, then and there promised the plaintiff to pay him the said sum. Yet the defendant has disregarded its said promises, and has not paid any of said several sums of money, or any part thereof, to the plaintiff's damage of $140,000, and therefore he brings suit." To which the defendant plead the general issue. Defendant also gave notice of set-off, specifying items to the amount of $154,004.38.

It was stipulated that upon the trial "either party may introduce any evidence tending to maintain its claim under the contract of date February 1, 1888, between said parties without regard to the state of the pleadings."

Upon the cross-examination of defendant in error, an agreement made and entered into by him with J. S. Berthold and C. M. Jennings, dated December 1, 1887, was identified and received in evidence. This agreement was made in contemplation of the contract upon

which this action is based, and is proper to be considered as throwing light upon its construction. Its material parts for this purpose are as follows:

"This agreement, made the first day of December, 1887, by and between J. S. Berthold, Henry O'Hara, and C. M. Jennings, individuals of the city of St. Louis, State of Missouri, witnesseth, that whereas Henry O'Hara and the firm of Berthold & Jennings are owners of certain railroad freight cars, as will be hereinafter specified, and are desirous of putting the same under one management and *virtual ownership*, for the purpose of avoiding conflicting interests and for the better management of said property, said individuals do hereby agree to form and incorporate themselves into a stock company under the laws of the State of Illinois, under the style and name of North & South Rolling Stock Company, for the purpose of owning, leasing and operating railroad rolling stock, and the buying and selling of same, and for any other purpose for which like companies are formed.

"And the said individuals do hereby agree to subscribe equally to the capital stock of said North and South Rolling Stock Company, in like number of shares, the capital stock, number of shares, and the par value of each share to be hereafter agreed upon before making application for incorporation of said company. The affairs and business of said company shall be conducted and managed by a board of directors consisting of three stockholders, who for the first twelve months and until their successors are elected, shall be the subscribers hereto. The officers of said company shall be a president, vice-president, manager, and secretary and treasurer, who shall comprise the board of directors as above stated. They shall be paid such amounts as may be ordered by the board of directors for their services. And it is further agreed that the said Henry

O'Hara and said Berthold and Jennings will lease said North and South Rolling Stock Co. the railroad freight cars owned separately by them and running on the St. Louis, Alton & Terre Haute R. R. (Belleville S. I. Division) as specified below for a term of fifteen years, with privilege of purchase as specified in said lease. The said Henry O'Hara shall lease to said company seventy-five stock cars numbered 2201 to 2275 inclusive and marked St. Louis & Cairo Short Line R. R., also two hundred box cars numbered 3501 to 3700 inclusive and marked St. Louis & Cairo Short Line R. R., valued as follows: $111,250 on which said Henry O'Hara is indebted to Railway Equipment Co. and Post, Martin & Co. $76,452, to W. D. Cutting 12,000, total $88,452. Berthold and Jennings lease to said North and South Rolling Stock Co. their rolling stock, as follows: (here follows description of said stock) total value $167,140. On the above cars owned by Berthold and Jennings there is due $40,000, and interest at 7 per cent to W. B. Cutting, which is evidenced by eight notes of $5,000 each. All and each of above mentioned amounts due on said cars as specified, and amounting in the aggregate to $128,452 with interest as stated on $40,000 at 7 per cent, shall be assumed and paid by the North and South Rolling Stock Company, and any such amounts with interest thereon from date of such payment by North and South Rolling Stock Company, at 6 per cent interest per annum, shall be allowed as a credit and considered as a part of the purchase money of said rolling stock, the purchase of which by said North and South Rolling Stock Company is hereby contemplated and expected to be consummated in the future.

"The said North and South Rolling Stock Co. shall pay as rental for said rolling stock 6 per cent per annum on the valuation as stated hereinbefore, which is to stand to the credit of the lessors on the books of

the company until said contemplated purchase is made and shall not be drawn out before.

"The mileage earned by said box and stock cars owned by Henry O'Hara up to December 1, 1887, to be charged to him on books of said North & South Rolling Stock Co., and credited to earnings of said Company."

WISE & McNULTY, attorneys for plaintiff in error.

All contracts should be construed so as to give full effect to the intention of the parties. The intention of the parties to this contract was that the company became the purchaser of the cars. It was a sale of them, the payment of the indebtedness on the cars was to be part of the purchase money, and the company had the entire ten years in which to pay for them. Lucas v. Campbell, 88 Ill. 447; Murch v. Wright, 46 Ill. 487; Reese v. Beck, 24 Ala. 651.

Courts are always inclined to interpret the language as a covenant, rather than as a condition subsequent. Board, Etc., v. First Baptist Church, 63 Ill. 204; 4 Kent's Com. 130; Gallaher v. Herbert, 117 Ill. 160; Boone v. Clark, 129 Ill. 498.

They will construe a clause as a promise or covenant, rather than a condition subsequent. Bishop on Contracts, Sec. 418; 2 Parsons on Contracts (1893 Ed.), bottom pages 643 and 644; Hoyt v. Kimball, 49 N. H. 322; Thornton v. Trammell, 39 Ga. 202; Packard v. Ames, 16 Gray, 327.

A court of equity will not lend its aid to divest an estate for a breach of a condition subsequent. Gallagher v. Herbert, 117 Ill. 160.

Nor enforce a forfeiture for the breach of a condition subsequent. Boon v. Clark, 129 Ill. 498; Douglas v. Insurance Co., 127 Ill. 116.

Forfeitures are odious in the law, and in enforcing

them courts should never search for that construction or language which may produce a forfeiture, when it will bear another construction which will not produce such a result; and are not enforced where an injustice will result. Voris v. Renshaw, 49 Ill. 425; Hartford Fire Insurance Co. v. Walsh, 54 Ill. 164; Home Life Insurance Co. v. Pierce, 75 Ill. 426.

The law never favors forfeitures by construction. Bullock v. Geomble, 45 Ill. 218.

If entitled to a forfeiture, by delaying to enforce in three years, it was waived. Smith v. Dennie, 6 Pick. 262; Hutchins v. Munger, 41 N. Y. 155; Fishback v. Van Dusen, 33 Minn. 111; Mixer v. Cook, 31 Me. 340; Scudder v. Bradbury, 106 Mass. 427; Goldsmith v. Bryant, 26 Wis. 34; Bowen v. Burke, 13 Pa. St. 146.

There can be no rescission of the contract because the parties can not be placed in *statu quo;* in order to rescind the contract, it is indispensable that the parties should be placed in that position. 2 Parsons on Con. (1893 Ed.), bottom page 795; Scanlan v. Cobb, 85 Ill. 296; Underwood v. West, 52 Ill. 397; Sanborn v. Batchelder, 51 N. H. 426; Hanchet v. Sorg, 15 Ill. App. 493; Doane v. Lockwood, 115 Ill. 490; Spencer v. St. Clair, 57 N. H. 9; Benson v. Cowell, 52 Iowa, 137.

If there can be a recovery on the first and second counts of plaintiff's declaration, then the defendant is entitled, either as recoupment or as a set-off, to the amount it paid to be applied on the purchase of the cars, namely, $91,393.16; and also as a set-off, the amount O'Hara was owing the company, as admitted by the contract, $7,693.10. Preston v. Whitney, 23 Mich. 260; Johnston v. Whittemore, 27 Mich. 463; Ketchum v. Brennan, 53 Miss. 596.

When the contract was made, O'Hara was vice-president of the company, and by the terms of the contract

he received one thousand shares of the capital stock of the par value of $100,000; for this stock he paid nothing; he has retained it and never tendered it back before bringing this suit. If this judgment stands, O'Hara receives the stock, the rentals and the value of his property. The company would be out $91,393.16, and the stock. Can O'Hara, as vice-president of the company, make a contract to receive these one thousand shares of stock? Is it not against public policy? Also, is it not void upon the principle that if any part of the entire consideration of a contract or any part of an entire promise be illegal, whether by statute or common law, the whole contract is void? Tobey v. Robinson, 99 Ill. 224; Tenney v. Foote, 95 Ill. 99; Henderson v. Palmer, 71 Ill. 579; Penn v. Bornman, 102 Ill. 523; Workingmen's Banking Company v. Rautenberg, 103 Ill. 460; Harris v. Hatfield, 71 Ill. 298; 1 Parsons on Con. 380.

M. MILLARD, attorney for defendant in error.

MR. JUSTICE WORTHINGTON DELIVERED THE OPINION OF THE COURT.

The decision of this case depends upon the construction of the contract of February 1, 1888, taken in connection with the facts of the case as they appear in evidence. Defendant in error bases his action upon the theory that plaintiff in error was in possession as a lessee with an option to buy, and that upon a failure to pay the six per cent rental when due, and to return the cars on demand, he, defendant in error, was entitled under the contract to recover the amount of rentals and the value of the cars free from any set-off or recoupment. Plaintiff denies that any rentals were due, denies that the agreement to pay rentals was in the nature of a condition subsequent, a failure to comply with which

would work a forfeiture of the contract with a liability in damages to the amount of the rentals and the value of the cars; and insists that the contract was in effect a contract of sale, which plaintiff in error had ten years from February 1, 1888, to complete.

And that if the rentals were due, the promise to pay was in the nature of a covenant and not a condition subsequent, the damages being not the amount of the rentals and the value of the cars, but the amount of the rentals only.

We think that the contract, though called a lease, was in legal effect, as understood and acted upon by the parties to it, a contract of sale, which plaintiff in error had ten years from February 1, 1888, to complete, and that a failure to pay the rentals when due was a breach of covenant for which defendant in error was entitled to recover only the amount of the rentals, less any balance then due plaintiff in error from defendant in error. We think, too, that defendant in error demanded more than he was entitled to demand under the contract, and his demand being inequitable, that he was in no position to declare a forfeiture.

The case is a peculiar one. In December, 1887, O'Hara and Berthold and Jennings entered into an agreement to form a corporation, to wit, plaintiff in error. They were to convey to it certain cars that they owned and upon which there was an indebtedness. The corporation was to pay the indebtedness and take credit for the amount paid as part of the purchase price. In the case of Berthold and Jennings, credit was to be given for all their indebtedness paid by the corporation; and in the case of O'Hara the corporation was to pay his indebtedness specified as $88,452, and to receive credit on the purchase price for $72,000 of such payment. Each individual was to subscribe equally to the capital stock, the amount of stock to be

afterward agreed upon, and the three were to be sole stockholders and directors for the first year and until their successors were elected. The corporation was to start with a charge against O'Hara to the amount of the mileage earned by the cars up to December 1, 1887. The total amount of indebtedness by this agreement was fixed at $128,452, being $88,452 of O'Hara's and $40,000 of Berthold's and Jennings.' The contract also provided that the $40,000 should bear seven per cent interest, which the corporation was to pay. It also provided that the amounts of payment of this sum of $128,452, with interest at six per cent from the dates of said payments, should be allowed as a credit to said corporation upon the purchase price. The object of forming this corporation was said to be "That, whereas, Henry O'Hara and the firm of Berthold & Jennings are owners of certain railroad freight cars, as will be hereinafter specified, and are desirous of putting the same under one management and *virtual ownership*, for the purpose of avoiding conflicting interests, and for the better management of said property, said individuals do hereby agree to form themselves into a stock company * * * for the purpose of *owning*, leasing and operating railroad rolling stock and buying and selling the same, etc."

In accordance with this agreement the North and South Rolling Stock Company was formed, O'Hara, Berthold and Jennings each receiving one thousand shares of stock rated as paid up stock. O'Hara, for himself, entered into the agreement with the corporation upon which this action is based. Berthold and Jennings entered into a similar agreement on their part. As per the agreement of December, 1887, the sum of $7,693.10 was to be charged upon the books of the corporation as a charge against O'Hara, being for mileage earned up to December 1, 1887. A charge against the corpora-

tion and in favor of O'Hara of $1,752 was to be entered, being, as is stated in the agreement, as "allowed to said party (O'Hara), in consideration of his putting in said rolling stock at par, and allowing said second party (plaintiff in error) the mileage earned during the same period of time."

It was also a part of this agreement of February 1, 1888, between the parties to this suit, that plaintiff in error should pay to O'Hara six per cent on the difference between the value of the cars and the indebtedness mentioned, this rental to be placed on the books to the credit of O'Hara, but not to be paid until after the indebtedness assumed in the contract is liquidated and canceled. Of the $88.452 of O'Hara's indebtedness, when paid, $72,000 was to be charged against him on the books of plaintiff in error as part of the purchase price. It will be observed that, in the language of the contract, "it is understood and mutually agreed that there is an indebtedness on said 76 stock cars due by Henry O'Hara of $12,000, payable in notes to the order of W. Bayard Cutting, and an indebtedness of $76,452 in notes payable to the order of Post, Martin & Co., being 120 notes of $637.10 each, payable monthly." This made a total indebtedness of $88,-452. There is nothing said about any interest to be paid upon this amount, or any part thereof. But in the contract of plaintiff in error with Berthold and Jennings it is specifically stated that interest at seven per cent was to be paid upon the $40,000 which they owed Cutting.

Both contracts bear the same date. It is fair to assume, then, upon the face of the agreement, that the amount of O'Hara's indebtedness that plaintiff in error was to pay was $88,452 without interest, the language of the contract being "the party of the second part (plaintiff in error) agrees to assume and pay the before

mentioned indebtedness as they fall due *amounting in all to $88,452.*'' But a part of this indebtedness bore interest, and plaintiff in error, in order to cancel the debt, had to pay $2,941.16 in excess of the $88,452. The debt was secured by mortgage. By the terms of the contract with O'Hara this mortgage was to be canceled.

Upon payment of the debt, plaintiff in error demanded that it should be canceled. It was O'Hara's duty, by his agreement, to see that it was canceled. Plaintiff in error, as a purchaser, or with an option to purchase under this agreement, had the right to insist that it should be canceled. O'Hara was then the first in default by not procuring it to be canceled.

On December 23, 1895, the date of demand upon plaintiff in error for $12,200 rentals, there was a charge by the agreement on which this suit is based of $7,693.10 against O'Hara. Also by the same agreement and of the same date, a credit to him of $1,752, leaving a net balance charged against him of $5,941.10. Plaintiff in error had paid for O'Hara upon his indebtedness, as shown before, $2,941.16 more than he had agreed to pay, but which had to be paid to lift the debt and leave the cars free. O'Hara, then, according to the evidence and agreement, was equitably indebted to plaintiff in error for the amount of these items, to wit, $5,941.10 plus $2,941.16, making $8,882.26. Deducting from this $1,752 charged against plaintiff in error, there was still left a balance of $7,130.26 coming from O'Hara to plaintiff in error. In what position was he then to demand $12,200 and declare a forfeiture for a failure to pay him that amount?

He had failed to have the mortgage canceled as he had agreed to do, and was demanding over $7,000 more than was then due him. ''The law does not favor forfeitures, and their prevention is within the protec-

tive power of equity whenever wrong and injustice will result from their enforcement.'' Voris v. Renshaw, 49 Ill. 425; Hartford Fire Ins. Co. v. Walsh, 54 Ill. 164.

What would be the result of holding that a forfeiture was worked by a breach of covenant to pay $12,200, even if this total amount was due when demanded?

O'Hara, Berthold and Jennings, as individuals, transferred to themselves as sole stockholders in a corporation, certain cars in which they had an equity. For the amount of their respective equities the corporation was to pay six per cent as rental. What they owed upon the cars the corporation was to pay and take credit therefor as part of the purchase money. O'Hara, according to the agreement, owed the corporation, to start with, $7,693.10. It paid his indebtedness, amounting to $91,393.16. His equity in the cars at the date of the agreement of December, 1887, was valued at $22,800.

To allow him damages for a forfeiture as claimed would be to wipe out his indebtedness on the cars of $91,393.16, his debt to plaintiff in error of $7,693.16, and give him in addition a judgment, as computed by the trial court, of $60,639.70, and an ownership of one thousand shares of paid up stock, one third of the entire property of the corporation.

Courts are not inclined to construe such clauses in contracts as conditions subsequent, when such construction would divest a purchaser or a lessee of his property or estate, or subject him to inequitable damages, but rather construe them as covenants, with damages to be assessed according to the actual injury. ''Courts do not regard forfeitures with favor, and they are never enforced unless the evidence is clear that such was the intention of the parties.'' The Home Ins. Co. v. Pierce, 75 Ill. 430; Gallaher v. Herbert, 117 Ill. 160; Douglas v. Ins. Co., 127 Ill. 116.

North & South Rolling Stock Co. v. O'Hara.

The court will construe a clause as a promise or covenant rather than as a condition subsequent when a forfeiture would thereby be caused.

"Mutual contracts sometimes contain a condition, the breach of which by one party permits the other to throw the contract up and consider it altogether null. Whether a provision shall have this effect, for which purpose it must be construed as an absolute condition, is sometimes a question of extreme difficulty. It is quite certain, however, that no formal words are now requisite to constitute a condition; and perhaps that no formal words will constitute a condition, if it be obvious from the whole instrument that this was not the intention or understanding of the parties.

"Courts seem to agree of late that the decision must always depend upon the intention of the parties, to be collected in each particular case from the terms of the agreement itself, and from the subject-matter to which it relates. It can not depend upon any formal arrangement of words, but on the reason and sense of the thing as it is to be collected from the whole contract. It is said that when the clause in question goes to the whole of the consideration it shall be read as a condition. The meaning of this must be that if the supposed condition covers the whole ground of the contract and can not be severed from it, a breach of the condition is a breach of the whole contract which gives the other party the right of avoiding or rescinding it altogether. But when the supposed condition is distinctly separable so that much of the contract may be performed on both sides as though the condition were not there, it will be read as a stipulation, the breach of which only gives an action to the injured party." 2 Parsons on Contracts (6 Ed.), p. 526, citing cases.

"Forfeiture means the loss of something as a penalty

for doing or attempting to do, or omitting to do a required act." 8 Am. and Eng. Ency. of Law, 443.

"When the subject-matter of the contract is such that the damages for its breach can be computed by definite rules, the courts will usually treat the sum agreed upon as a penalty, especially if there is great disparity between the agreed sum and the actual damages." 5 Am. and Eng. Ency. of Law, 25; Bishpam's Equity (3 Ed.), 234.

"It may, therefore, be laid down as a settled rule that no other sum can be recovered under a penalty than that which shall compensate the plaintiff for his actual loss." Sedgwick on Damages (7 Ed.), 207; Dehler v. Held, 50 Ill. 491; Scofield v. Thompkins, 95 Ill. 190; Morris v. McCoy, 7 Nev. 399; Birrenkott v. Traphagen, 39 Wis. 219.

In this case the damages were easy of computation. They were the amount due at six per cent on O'Hara's equity in the cars. The covenant to pay this rental was one of the covenants in the general agreement of minor importance, compared with the scope of the agreement, and not essential to it. The agreement upon which this action was based contains the following clause: "The party of the second part agrees to purchase said rolling stock from the party of the first part within ten years from date hereof, at the price and sum for each car hereinafter mentioned, to wit, four hundred and seven dollars and forty cents ($407.40) for each and every stock car, and four hundred and seventeen dollars and fifty-two cents ($417.52) for each and every box car, and when said party of the second part shall give notice in writing to the party of the first part of its desire to complete and consummate that part of this contract, the said party of the first part shall, on payment of any amounts found to be

due him, execute a bill of sale for said rolling stock to the party of the second part."

Plaintiff in error has until February 1, 1898, to complete the purchase. The testimony shows that it is entitled to a credit of $72,000 on the purchase price, also a credit of $7,693.10. It has paid, in addition, $2,941.16 upon the indebtedness of O'Hara, thus freeing the cars conveyed by him to it from a mortgage lien.

It has demanded the cancellation of the mortgage on the cars. It has also paid insurance, taxes and for repairs. Whether or not it has paid the $40,000 due from Berthold and Jennings does not appear from the evidence. But enough does appear to indicate that it is complying with its contract "to purchase said rolling stock from the party of the first part within ten years from date of the agreement."

It is not entitled by said contract to a bill of sale until it has paid in full. But a bill of sale is not the sale. It is only an evidence of sale.

"When the transaction between the parties is in realty and in legal effect a sale, conditioned upon the payment of the purchase price in successive installments, it can not be modified, nor its legal effect avoided, by the fact that they speak of it as a lease, and call the installments rent." 3 Am. and Eng. Ency. of Law, 426; Hervoy v. Locomotive Works, 93 U. S. 664.

For the reasons above stated, we do not think the judgment of the court is authorized, and it is therefore reversed and the case remanded.